**NEW MEXICO FEDERATION OF LABOR, UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 1564, Communications Workers of America, and International Brotherhood of Electrical Workers Local 611, Plaintiffs,**

v.

**CITY OF CLOVIS, NEW MEXICO, Defendant.**

No. 89–896–M Civil.

United States District Court, D. New Mexico.

April 27, 1990.

Simon & Oppenhemier, Morton S. Simon, Jane Bloom Yohalem, Santa Fe, N.M., Laurence Gold, Washington, D.C., Marsha S. Berzon, Fred H. Altshuler, Altshuler and Berzon, San Francisco, Cal., for plaintiffs.

Hal Stratton, Atty. Gen., Terran W. Mast, Asst. U.S. Atty., Santa Fe, N.M., for State of N.M.

Garrett & Richards, Michael T. Garrett, Clovis, N.M., for defendant.

## MEMORANDUM OPINION AND ORDER

MECHEM, Senior District Judge.

This matter came on for consideration on plaintiffs' motion for a preliminary injunction. Before the hearing on the preliminary injunction, the parties stipulated that the matter would involve only a declaratory judgment without a request for an injunction. A hearing was held on September 18, 1989. Having considered the motion and various responses and replies before and after the hearing, the evidence and arguments of counsel, the proposed findings of both parties, and being otherwise fully advised in the premises, I find that Ordinance No. 1345–89 enacted by the City of Clovis, New Mexico is invalid.

### BACKGROUND

The defendant, City of Clovis, New Mexico, is a home rule municipality organized under the laws of the State of New Mexico. The New Mexico Constitution provides that a home rule municipality "may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. Const. Art. X, § 6(D).

On May 4, 1989, the Clovis City Council passed a right-to-work ordinance (the Ordinance) which prohibits employers within Clovis from requiring, as a condition of employment, membership in a labor organization or payment of any dues, assessments, or other charges to a labor organization (union security provision). The Ordinance further prohibits employers from requiring any person to be referred by a labor organization as a condition of employment (hiring hall provision) or from deducting union dues, fees, assessments or other charges from wages unless the employee's authorization for such deductions can be revoked at any time (dues deduction provision). Any violation of the Ordinance is a misdemeanor subject to a fine of up to $900 or imprisonment of not more than 30 days or both.

This action is brought by a group of labor organizations whose various labor relationships in Clovis would be affected by the Ordinance. The organizations request that I declare the Ordinance invalid under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (NLRA or the Act), and that I enjoin its enforcement. As discussed, this matter now involves only a declaratory judgment. Defendant agreed to stay enforcement of the Ordinance until a final decision is rendered, after appeal, if any, and defendant further agreed not to enforce any provision declared invalid.

On September 18, 1989, the parties stipulated that the hiring hall provision of the Ordinance is invalid as to labor relationships covered by the NLRA. The defendant conceded in its November 14, 1989 supplemental brief that the dues deduction provision in the Ordinance is likewise invalid under *SeaPAK v. Industrial, Technical & Professional Employees, Division of Nat'l Maritime Union,* 300 F.Supp. 1197 (S.D.Ga.1969), *aff'd per curiam,* 423 F.2d 1229, (5th Cir.1970), aff'd *per curiam,* 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971). Therefore, I am left to determine whether the union security provision of the Ordinance is valid.

## DISCUSSION

The NLRA generally governs the bargaining process between private employers and the unions chosen by a majority of their employees to represent them. Under the NLRA, employers and unions are required to bargain collectively concerning "conditions of employment." 29 U.S.C. §§ 158(a)(5), 158(b)(3), 158(d), 159(a). One of the "conditions of employment" that Congress specifically permits employers and unions to bargain over is the union security agreement, as long as the agreement reached conforms to the provisions of § 8(a)(3) of the Act.[1] The Ordinance would make all union security agreements unlawful, even those that conform to the strictures contained in § 8(a)(3).

---

1. Section 8(a)(3) of the Act provides: (a) It shall be an unfair labor practice for an employer— .... (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as

provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; ...

29 U.S.C. § 158(a)(3)

The only exception in the NLRA to the federal regulation of union security agreements is § 14(b) of the Act, 29 U.S.C. § 164(b), which provides:

(b) Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

The initial question for me to determine is whether, by enacting the NLRA generally, and § 8(a)(3) specifically, Congress has preempted the field of regulation of union security agreements such that § 14(b) of the Act is the sole source from which States derive their power to regulate union security agreements. Plaintiffs contend that is the case. Defendant, however, claims that Congress did not intend preemption but rather merely intended to continue the policy of the Act's predecessor, the Wagner Act, of deferring to the various states' labor policies, which may include referring the matter to local governmental subdivisions for determination. Defendant argues that because § 8(a)(3) was not intended to preempt the field, its Ordinance is valid. *See Finman, Local "Right to Work" Ordinances: A Reply*, 10 Stan. L.Rev. 53, 63 (1957).

■ Congress has the power to preempt state and municipal authority in a particular field. *Wardair Canada, Inc. v. Florida Dept. of Revenue*, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). In determining whether federal legislation preempts state and local law, the test is one of Congressional intent. *Id.* at 6, 106 S.Ct. at 2372. Where the statutory language expressly prohibits states and municipalities from legislating in a particular area, preemption is manifest. *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Otherwise, preemption may be inferred from the pervasiveness of the federal scheme, *e.g., White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) or from where state or municipal law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," *e.g., Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

■ The Congressional regulation of union security agreements is comprehensive and pervasive. *See Retail Clerks Internat'l Ass'n Local 1625 AFL–CIO, et al. v. Schermerhorn*, 375 U.S. 96, 100, 84 S.Ct. 219, 220–21, 11 L.Ed.2d 179 (1963). Section 8(a)(3) of the NLRA provides for specific conditions which must be met in order for an agreement to be valid. Congress intended to prohibit non-federal laws which would allow agreements impermissible under the Act. *Finman, supra* at 64, (citing H.R.Rep. No. 245, 80th Cong., 1st Sess. 9, 34 (1947); S.Rep. No. 105, 80th Cong., 1st Sess. 5–7 (1947)). This indicates to me that Congress intended an exclusive regulatory system and that § 8(a)(3) so thoroughly regulates the subject of union security agreements so as to preempt the matter from state legislation except to the extent specifically permitted under § 14(b) of the Act.

A myriad of local regulations would create obstacles to Congress' objectives under the NLRA. If the Ordinance is allowed to stand, other local governmental entities in New Mexico and presumably elsewhere could enact such ordinances, or different ordinances, concerning the same subject matter. The result would be a crazy-quilt of regulations within the various states. Defendant argues that by enacting § 14(b), Congress intended to "suffer a medley of attitudes and philosophies" on the subject of union security agreements. *See Retail Clerks Internat'l Ass'n, supra*, 375 U.S. at 104–05, 84 S.Ct. at 223–24. Defendant further contends that the fact that state right-to-work laws are inapplicable to federal enclaves within the states shows that there is no uniformity in the administration of union security agreements even within given states.

It is true that by enacting § 14(b), Congress contemplated diversity of regulation throughout the country on the subject of union security agreements. *Id.* However, the diversity that arises from different regulations among various of the 50 states and the federal enclaves within the 21 right-to-

work states is qualitatively different from the diversity that would arise if cities, counties, and other local governmental entities throughout the country were free to enact their own regulations. A consequence of such diversity for both employers and unions would be to subject a single collective bargaining relationship to numerous regulatory schemes thereby creating an administrative burden and an incentive to abandon union security agreements. This result would effectively undermine Congress' determination in § 8(a)(3) of the Act that union security agreements are consistent with federal labor policy and would similarly undermine the NLRA's purpose by discouraging rather than encouraging bargaining on "conditions of employment." I agree with the court of appeals in *Kentucky State AFL–CIO v. Puckett*, 391 SW.2d 360 (Ky.Ct.App.1965) that:

> [I]t is not reasonable to believe that Congress could have intended to waive other than to major policy-making units such as states and territories, the determination of policy in such a controversial area as that of union security agreements. We believe Congress was willing to permit varying policies at the state level, but could not have intended to allow as many local policies as there are local political subdivisions in the nation.

*Id.* at 362.

In *Kentucky State AFL–CIO, supra,* the only reported decision precisely on point, the court held that by enacting § 8(a)(3) of the NLRA, Congress intended to preempt the field of union security agreements and that Congress enacted § 14(b) as an exception to the otherwise full preemption by the Act. *Id.* at 362. Therefore, Congress preempted from cities the powers to enact an ordinance outlawing union security agreements. *Id.* The court further stated that the § 14(b) exception "should be strictly and narrowly construed because it represents a departure from the overall spirit and purpose of the Act." *Id.* (citations omitted).

In *Oil, Chemical & Atomic Workers, Internat'l Union v. Mobil Oil Corp.,* 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), the Court, citing *Kentucky State*

*AFL–CIO* with approval, stated that § 14(b) is what gives the states the power to regulate union security agreements:

> There is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible. As we recognized in *Retail Clerks v. Schermerhorn,* 375 U.S., at 103 [84 S.Ct. at 222–23], it is "§ 14(b) [which] *gives the States power* to outlaw even a union security agreement that passes muster by federal standards." Cf. *Kentucky State AFL–CIO,* 391 S.W.2d 360 (Ky.1965); *Grimes & Hauer, Inc. v. Pollock,* 163 Ohio St. 372, 127 N.E.2d 203 (1955).

*Id.* 426 U.S. at 413 n. 7, 96 S.Ct. at 2143 n. 7 (emphasis added). And in *Retail Clerks, supra,* the Supreme Court stated:

> Yet even if the union security agreement clears all federal hurdles, the States *by reason of § 14(b)* have the final say and may outlaw it. There is thus conflict between state and federal law; but it is a conflict sanctioned by Congress ... § 14(b) *gives the States power* to outlaw even a union security agreement that passes muster by federal standards.

*Id.* 375 U.S. at 102–03, 84 S.Ct. at 222 (emphasis added).

These cases support the finding that Congress intended to preempt the field except to the extent permitted under § 14(b).

I additionally considered the legislative history of the Act along with the arguments raised by the parties and those presented in *Finman, supra,* and Burke & Brunn, *Local Right to Work Ordinances: A New Problem in Labor & Local Law,* 9 Stan.L.Rev. 674, 676 (1957) concerning the legislative history of the preemption issue. As is most often the case, internal conflict exists within the legislative history of this issue and portions of the legislative history can support either position. I find the legislative history to be generally unhelpful in determining the preemption issue.

■ It is my conclusion that Congress preempted the field of regulation of union security agreements, except to the extent specifically permitted in § 14(b). The re-

maining issue then becomes whether local right-to-work enactments, either through home rule authority or otherwise, constitute "state" law within the meaning of § 14(b). I find that they do not. There is nothing in the legislative history of § 14(b) to indicate that Congress intended a broad reading of "state." *Finman, supra,* at 70 (citing NLRB, Legislative History of the Labor Management Relations Act (1947)). No one proposed that the power to regulate union security agreements should be localized to this extent. Even opponents of the Act did not argue that a problem with the Act was that political subdivisions of a State could legislate in the field. *Id.* The myriad of potential regulations which would create obstacles to Congress' objectives of the Act and the case law, all discussed above, contribute to my conclusion. In addition, it is necessary to look at the actual statutory language.

When determining the scope of a statute, courts are to look to its actual language. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* As just discussed, no "clearly expressed legislative intention to the contrary" exists.

Looking to the language of the statute, § 14(b) permits union security agreements to be prohibited by "State or Territorial law." No mention is made of local ordinances or other means. "Congress is presumed to use words in their ordinary sense unless it expressly indicates the contrary." *Henry T. Patterson Trust by Reeves Banking & Trust Co. v. United States,* 729 F.2d 1089, 1094 (6th Cir.1984) (quoting *Davis Bros., Inc. v. Donovan,* 700 F.2d 1368, 1370 (11th Cir.1983)). In ordinary usage, the words "State or Territorial law" would not include legislation enacted by political subdivisions of the state. *Finman, supra,* at 69. Courts have held that as a matter of plain language, reference to a "state" does not include reference to subdivisions of the state. *E.g., Consolidated Rail Corp. v. Smith,* 664 F.Supp. 1228, 1237 (N.D.Ind.1987) (citing numerous cases).

Furthermore, in analyzing the language of the Act in general, when Congress intended to cover subdivisions of the state, it did so directly. For example, § 2(2) of the NLRA, 29 U.S.C. § 152(2) in defining "employer" provides that employer does not include "any state *or political subdivision thereof.*" (Emphasis added). Congress contemplated and made the distinction once. I can see no reason why it would not have made the distinction in § 14(b) as well if that is what it had intended. The plain language of the statute indicates to me that only a state, through state legislation, may prohibit union security agreements. Such state legislation does not include a state law granting local political subdivisions permission to prohibit union security provisions. Such a law would not itself prohibit the provision and, therefore, does not come within the exception created by § 14(b). Ordinance No. 1345–89 is invalid.

Based on these findings and conclusions, I find it unnecessary to address the question of whether under New Mexico law the City of Clovis has the authority to enact the Ordinance at issue.

IT IS SO ORDERED.