RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 3047, et al.,

> *Plaintiffs-Appellees,*

> No. 16-5246

*v.*

HARDIN COUNTY, KENTUCKY, et al.,

> *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:15-cv-00066—David J. Hale, District Judge.

Argued: October 18, 2016

Decided and Filed: November 18, 2016

Before: BOGGS, SUHRHEINRICH, and McKEAGUE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** John T. Lovett, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellants. James B. Coppess, AFL-CIO LEGAL DEPARTMENT, Washington, D.C., for Appellees. **ON BRIEF:** John T. Lovett, Kyle D. Johnson, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellants. James B. Coppess, Craig Becker, AFL-CIO LEGAL DEPARTMENT, Washington, D.C., Irwin H. Cutler, Jr., Louisville, Kentucky, Robert M. Colone, Louisville, Kentucky, for Appellees. Mitchel T. Denham, Matt James, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Kevin J. Hobson, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Amici Curiae.

1

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.   This case presents a challenge by numerous collective bargaining organizations to a Kentucky county's so-called "right to work" ordinance.   The Unions contend the ordinance is unenforceable because it is preempted by the National Labor Relations Act.

The district court awarded summary judgment to the unions, holding that the ordinance is preempted.   The court recognized that the NLRA expressly excepts from preemption such right-to-work protections under "State law," but held that the law of a State's political subdivision is not "State law."   For the reasons that follow, we affirm in part and reverse in part.

## I. BACKGROUND

The National Labor Relations Act ("NLRA") is undoubtedly intended to create a national, uniform body of labor law and policy, but the language used to carry out this purpose is not definite.   Further, although the NLRA has been a fixture of the American legal landscape for more than 80 years, there is little authoritative case law on the instant question regarding the Act's preemptive scope.   In the absence of any controlling authority, the district court relied primarily on a canon of construction. The court described the context for its decision clearly and succinctly as follows:

> The National Labor Relations Act is a broad federal law that regulates the relationships between employers and unions.   The NLRA permits agreements between employers and unions that require employees to join or pay dues to the union, known as union-security agreements.   But the NLRA also permits "State or Territorial" laws that prohibit such agreements, commonly referred to as right-to-work laws.   The primary question presented by this lawsuit is whether a right-to-work law may be enacted solely by a state or territorial government, or whether a local government—in this case a county—may pass a law prohibiting union-security agreements.   Because the Court finds that local regulation of union-security agreements is preempted by the NLRA, the right-to-work ordinance at issue here is invalid.

The Fiscal Court of Hardin County is the legislative body for Hardin County, a political subdivision of the Commonwealth of Kentucky. In the absence of a Kentucky state law prohibiting union-security agreements, the Hardin Fiscal Court passed a county ordinance on January 13, 2015, Ordinance 300, which purports to ensure that no employee is required to join or pay dues to a union. The right-to-work provision is found in Section 4 of Ordinance 300, which states that

> no person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:
>
> . . .
>
> (B) to become or remain a member of a labor organization;
>
> (C) to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization; [or]
>
> (D) to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization[.]

Section 6 of the ordinance declares any such agreements "unlawful, null and void, and of no legal effect."

The plaintiff labor organizations assert that Sections 4 and 6 of the ordinance violate the Supremacy Clause of the Constitution. According to the plaintiffs, the NLRA preempts right-to-work laws not specifically authorized in § 14(b) of the Act, including the Hardin County ordinance. Also preempted, they argue, is Ordinance 300's regulation of "hiring-hall" agreements—which require prospective employees to be recommended, approved, referred, or cleared by or through a labor organization—and "dues-checkoff" provisions—which require employers to automatically deduct union dues, fees, assessments, or other charges from employees' paychecks and transfer them to the union. The defendants, various Hardin County officials, contend that the ordinance constitutes state law within the meaning of § 14(b) and thus is not preempted by the NLRA.

In 1935, Congress enacted the National Labor Relations Act, which established federal labor relations standards and the National Labor Relations Board. *See* 29 U.S.C. § 151 *et seq.* In response to abuses of closed-shop agreements, which mandated that only union members be hired, Congress enacted the Taft-Hartley Act banning such agreements. *See Oil, Chemical & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 414-17 (1976). Congress still allowed for union-shop agreements, which require employees to

join the union soon after they are hired, and agency-shop agreements, which require employees to pay union dues whether or not they are members of the union. *Id*. at 409 & n.1.  In § 14(b) of the NLRA, however, Congress gave any State or Territory the option to exempt itself from that policy.  *Id*. at 409 & n.2.

> Section 14(b), entitled "Construction of Provisions," provides: Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b).  Union-security agreements are also addressed in § 8(a)(3). Pursuant to that section, it is an unfair labor practice for an employer

> by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later[.]

29 U.S.C. § 158(a)(3).  Thus, § 8(a)(3) provides that no federal statute shall preclude union security agreements, while § 14(b) provides that state and territorial laws prohibiting such agreements shall take precedence over the NLRA. In other words, if Ordinance 300 constitutes state law within the meaning of § 14(b), it is valid and enforceable.  If not, then the question is whether the NLRA preempts a regulation that falls outside of that section.

*United Automobile, Aerospace and Agricultural Implement Workers of America v. Hardin Cty., Ky.*, 160 F. Supp. 3d 1004, 1006–08 (W.D. Ky. 2016) (headings, footnotes, and record citations omitted).

The district court went on to conclude that Hardin County's Ordinance 300 is not "State law" under § 14(b) and is therefore not excepted from preemption under that section.  *Id.* at 1010.  The court further found that, apart from § 14(b), the NLRA preempts, as a function of *Garmon* field preemption, state and local regulation of any activity that the NLRA even arguably protects or prohibits.  *Id.* at 1010–12 (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)).  Reasoning that § 14(b) is the only exception to this broad

preemption, and that § 14(b) does not encompass the law of a local subdivision, the court held that the County's right-to-work ordinance—a law that regulates union-security agreements, an activity "protected" by § 8(a)(3) of the NLRA— is preempted and unenforceable. *Id.* Also preempted, the court held, are the ordinance's prohibitions of (a) "hiring hall" agreements— which require prospective employees to be recommended, approved, referred, or cleared by or through a labor organization; and (b) "dues checkoff" provisions—which require employers to automatically deduct union dues, fees, assessments, or other charges from employees' paychecks and transfer them to the union. *Id.* at 1012–14.

Hardin County contends on appeal that because it is a subdivision of state government, its laws do come within the § 14(b) exception; and that, even if the court disagrees, the ordinance is still valid because Congress has expressly declined to occupy the field of union-security agreement regulation.

## II. ANALYSIS

### A. Meaning and Significance of § 14(b)

#### (1) *Statutory Construction*

All of the County's claims of error present questions of law, which we review de novo. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 628 (6th Cir. 2016). There are no disputed issues of fact and, on de novo review, the district court's legal conclusions are entitled to no deference.

The NLRA was enacted to "obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'" *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters, Chauffeurs and Helpers Local Union*, 346 U.S. 485, 490 (1953)). "The federal regulatory scheme (1) protects some activities, though not violence, (2) prohibits some practices, and (3) leaves others to be controlled by the free play of economic forces." *Nash-Finch*, 404 U.S. at 144 (citation omitted). "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare

picketing free for purposes or by methods which the federal Act prohibits." *Id.* (quoting *Garner*, 346 U.S. at 500).

Yet, despite the breadth of Congress's purpose to create a national, uniform body of labor law and policy, the boundaries of federal preemption "are not susceptible of delimitation by fixed metes and bounds." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 240 (1959). "The extent to which the variegated laws of the several States are displaced by a single, uniform, national rule has been a matter of frequent and recurring concern . . . 'of a Delphic nature, to be translated into concreteness by the process of litigating elucidation.'" *Id.* at 241 (quoting *Int'l Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 619 (1958)).

Indeed, more than fifty years after the *Garmon* Court recognized the role of "litigating elucidation," the extent of NLRA preemption of laws regulating union-security agreements has not been fully concretized. But even assuming the NLRA has preemptive reach in this area, Hardin County contends the right-to-work protection afforded by § 4 of Ordinance 300 is clearly excepted from preemption by § 14(b) of the NLRA. The district court decided this was not clear at all. Again, the full text of § 14(b):

> Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b). The district court rejected the County's argument that its right-to-work ordinance—prohibiting employers from requiring union membership as a condition of employment—being a law of a political subdivision of the very entity whose authority § 14(b) purports to respect, is, in effect, "State law" for purposes of § 14(b)'s exception from preemption.

The district court relied primarily on a rule of statutory construction: "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Applying this rule, the court explained:

> [I]t makes little sense to read "State or Territorial law" as encompassing local law in light of the statute's previous reference to "any State or Territory"—if "State or Territorial law" includes the laws of political subdivisions, then the statute must be read "in any State or Territory [or political subdivision thereof]" to avoid assigning two different meanings to "State" in the same sentence. This is not a logical reading . . . .

*United Automobile*, 160 F. Supp. 3d at 1008.

Yet, it absolutely *is* a logical reading. In the district court's formulation, *if*, as the County posits, "State law," as used in § 14(b), includes the laws of political subdivisions of the State, then the first reference to State in § 14(b) must be read to mean "in any State or political subdivision thereof" to avoid assigning two different meanings to "State" in the same sentence. Exactly. That *is* the County's argument and it is a logical and necessary product of applying the *Powerex* presumption-of-consistent-usage maxim to § 14(b), given the County's premise.

Moreover, the County's position is even stronger when we turn the formulation around. That is, if the *first* reference to "State" in § 14(b) (referring to a geographical jurisdiction) includes political subdivisions of the State (which it plainly must, as political subdivisions are components of the State, with*in* the State, that exercise governmental power of the State), then the second reference to State must also be read to include political subdivisions, thereby necessarily excepting the law of political subdivisions from preemption as well. In other words, applying the *Powerex* presumption-of-consistent-usage maxim does not defeat the County's argument, but supports it. Insofar as the presumption-of-consistent-usage maxim plays a role in construing § 14(b), it strongly favors the County's position that "State" includes political subdivisions and that its right-to-work ordinance is *not* preempted by the NLRA.

Insofar as the district court's construction of § 14(b) relied on the maxim to reject the County's position, it is flawed. Yet, we may affirm if the district court nevertheless reached the correct result.

**(2)** *Case Law*

(a) *Wisconsin Public Intervenor v. Mortier*

Before adopting the *Powerex* maxim as the basis for its construction of § 14(b), the district court also considered and rejected as distinguishable two Supreme Court decisions asserted by the County. The first of these is *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991). In *Mortier*, the Court held that the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which expressly permits "States" to regulate pesticides, does not preempt regulation of pesticides by local governments. The Court held that, even though the FIFRA provision allowing state regulation did not also expressly allow regulation by political subdivisions of the State, "[m]ere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Id.* at 607 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Further, in language directly applicable to the present controversy, the Court reasoned:

> The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . in its absolute discretion. The exclusion of political subdivisions cannot be inferred from the express authorization to the "States" because political subdivisions are components of the very entity the statute empowers. Indeed, the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the absolute discretion of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.

*Id.* at 607–08 (internal quotation marks, alterations and citations omitted).

Here, as in *Mortier*, we consider federal statutory language that expressly allows specific regulation by the States, but is silent as to regulation by political subdivisions of the States. Here, as in *Mortier*, we consider a "comprehensive regulatory statute" that does not explicitly preempt local regulatory authority. *Id.* at 601. Here, as in *Mortier*, we consider the meaning of a statutory provision where "no other textual basis for pre-emption exists." *Id.* at 608. Here, as in *Mortier*, we consider Congress's use of the term "State," which "is not self-limiting since political subdivisions are merely subordinate components of the whole." *Id.* at 612. And here,

as in *Mortier*, we are faced with unconvincing "policy speculations," rather than evidence of a "clear and manifest indication that Congress sought to supplant local authority." *Id.* at 611.

*Mortier* thus represents strong support for Hardin County's argument that, as a political subdivision of the Commonwealth of Kentucky, it enjoys the same freedom that Kentucky does under § 14(b). The district court distinguished *Mortier* by saying "the Court's conclusion was based on the specific statutory language at issue and thus was not a broad pronouncement regarding Congress' use of the term 'State' in federal statutes." *United Automobile*, 160 F. Supp. 3d at 1009. True enough, the *Mortier* Court dealt with a different regulatory scheme and did not purport to make a broad pronouncement. But the district court failed to identify, and we fail to discern, any material distinction between the operative principles in the *Mortier* analysis and the instant case.[1]

### (b) *City of Columbus v. Ours Garage and Wrecker Service*

The second case distinguished by the district court is *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424 (2002). In *Ours Garage*, the Court again addressed whether a federal law, the Interstate Commerce Act ("ICA"), that expressly excepted state safety regulatory authority from preemption, also excepted such regulations of political subdivisions of the State. Disproving the district court's notion that the *Mortier* ruling is limited to its facts or the particular language of FIFRA, the Court closely followed the *Mortier* analysis in holding:

> Absent a clear statement to the contrary, Congress' reference to the "regulatory authority of a State" should be read to *preserve, not preempt*, the traditional prerogative of the States to delegate their authority to their constituent parts.

*Ours Garage*, 536 U.S. at 429 (emphasis added). How a State chooses to exercise the governmental powers entrusted to it, the Court observed, is in its "absolute discretion." *Id.* at 437 (quoting *Mortier*, 501 U.S. at 608). The Court reiterated that mere silence is insufficient to establish a clear and manifest purpose to preempt local authority. *See also Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004) (noting "that federal legislation threatening to

---

[1]The Unions and the Commonwealth of Kentucky, as amici curiae, attempt to distinguish *Mortier* by arguing that the NLRA occupies the field of industrial relations regulation more comprehensively than does FIFRA, and that this demands that § 14(b)'s silence as to political subdivisions be construed differently. This proposition, colorable but unpersuasive, is addressed below in Part II.B.

trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of [a] plain statement [by Congress]").

This was the *Ours Garage* holding, notwithstanding that the ICA expressly preempted various types of regulation by a State *and* its political subdivisions, but excepted safety regulations by a State without mentioning political subdivisions; and notwithstanding that in several other parallel provisions excepting other types of state regulatory authority, the ICA also expressly excepted such authority of the State's political subdivisions. This inconsistency made for a strong dissent by two justices, who would have *presumed* the disparate omission of the term "political subdivisions" in the subject provision signaled Congress's purpose not to except local regulation from preemption. Yet, in reversing the Sixth Circuit, seven justices abided by the rule that mere silence is insufficient to justify such a presumption of congressional intent.

*Ours Garage* thus represents even stronger authority for Hardin County's position than *Mortier*. The NLRA does not expressly preempt state or local authority to prohibit union-security agreements—although § 8(a)(3) provides that no *federal* law shall be construed to preclude an employer from entering into a union-security agreement. On the other hand, the NLRA does expressly recognize state authority to prohibit union-security agreements. Granted, this recognition of state authority is silent as to political subdivisions of the State. Per *Ours Garage*, this silence is to be construed as preserving state authority to delegate its governmental powers to its political subdivisions as it sees fit.[2] Yet, again, without directly engaging the Court's reasoning in *Ours Garage*, the district court simply concluded that the Court's holding was limited to "the specific statutory language at issue." *United Automobile*, 160 F. Supp. 3d at 1009. Finding no guidance in *Mortier* and *Ours Garage*, the district court relied on its flawed application of the *Powerex* maxim to reach a conclusion diametrically opposed to those holdings,

---

[2]Hardin County, a political subdivision of the Commonwealth of Kentucky, is one of twelve Kentucky counties that have adopted such right-to-work ordinances. Hardin County enacted Ordinance 300 in January 2015 pursuant to its authority, under Kentucky Revised Statutes § 67.803, to regulate commerce and promote economic development. R. 5-1, Ordinance 300, Page ID 95. The lawfulness of the ordinance as a legitimate exercise of state-delegated governmental authority has not been challenged in this litigation.

essentially presuming that Congress's silence in § 14(b) implies an intent to *preempt, not preserve* the authority of political subdivisions.  Clearly, this conclusion, too, was in error.**3**

    (c) *CSX Transportation v. City of Plymouth*

    As amicus curiae, the Commonwealth of Kentucky cites a Sixth Circuit ruling that seems to run counter to *Mortier* and *Ours Garage*.  In *CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626 (6th Cir. 1996), the court considered an express exception to express preemption under the Federal Railway Safety Act ("FRSA").  Because the exception applied only to safety regulations of a "State," the exception was summarily held not to encompass Plymouth's municipal regulation:  "As Plymouth is not a 'State,' the challenged Plymouth ordinance is not within the FRSA's preemption clause exceptions." *Id.* at 628.  In so ruling, the court cited a line of lower court decisions so construing the FRSA exception provision, but did not cite any Supreme Court precedent, including *Mortier.*

    The *CSX Transportation* ruling predated *Ours Garage*.  It was followed in a subsequent Sixth Circuit decision, *Petrey v. City of Toledo*, 246 F.3d 548, 562 (6th Cir. 2001), but *Petrey* was essentially overruled by *Ours Garage*.  *See Mason and Dixon Lines Inc. v. Steudle*, 683 F.3d 289, 295 (6th Cir. 2012) (recognizing abrogation).  So, what is the remaining significance of *CSX Transportation*?  We acknowledge that the preemptive effect of each federal regulatory scheme (and exception thereto) is defined by its own body of case law, as Congress's intent is divined with reference to the subject statutory language, rules of construction, and legislative history.  It follows that *CSX Transportation*'s *specific* holding that the subject FRSA preemption exception did not encompass local regulations carries little weight in relation to our construction of NLRA § 14(b).  However, to the extent that *CSX Transportation* is here relied on for the *general* proposition that "State" does not include political subdivisions, it clearly lacks any continuing vitality in the wake of *Ours Garage*.

---

**3**Again, the Unions defend the district court's ruling by arguing that the NLRA is field-preemptive, and that the § 14(b) exception should be read more strictly than the exception in the ICA.  The question of field preemption is taken up below in Part II.B.  Here, suffice it to say that there is precious little support in the reasoning of either *Mortier* or *Ours Garage* for the notion that "State" would have been given a different meaning if the comprehensive regulatory scheme at issue were even more comprehensive.  In this regard, we note that, although the National Labor Relations Board has filed an amicus brief in support of the Unions' position, it is conspicuously devoid of reference to *Mortier* and *Ours Garage*.

A better reflection of the current state of Sixth Circuit law is found in *State of Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016), where the court, relying on *Nixon v. Missouri Municipal League*, 541 U.S. 125, 135–41 (2004), essentially followed the teaching of *Mortier* and *Ours Garage* in enforcing the "clear statement rule." The court effectively held that absent a clear statement from Congress in the Telecommunications Act, the FCC lacks preemptive authority to "trench" on the "core sovereignty" of a state by "reorder[ing] the decision-making structure of [the] state and its municipalities." *State of Tennessee*, 832 F.3d at 611.

> Although preemption authority does not have to be explicit, *see Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991), the authority to preempt such allocations must be delegated by way of a clear statement. In applying the clear statement rule, the federal statute should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement that *Gregory* requires.

*Id.* at 613 (internal quotation omitted). Finding no such clear statement by Congress in the Telecommunications Act, the court held that "a state's allocation of powers between itself and its subdivisions" was not preempted. *Id.* It follows then, pursuant to current Sixth Circuit law, that because Congress, in § 14(b) of the NLRA, has expressly excepted a particular type of state law from preemption, it can hardly be deemed to have intended to nonetheless preempt such laws of the State's political subdivisions absent a clear statement to that effect.

(d) *Kentucky State AFL-CIO v. Puckett* and *New Mexico Fed'n of Labor v. City of Clovis*

The briefing also includes citation to two decisions that specifically held that § 14(b) does not encompass laws of political subdivisions. In *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360 (1965), the Kentucky Supreme Court summarily concluded: "We think it is not reasonable to believe that Congress could have intended to waive other than to major policy-making units such as states and territories, the determination of policy in such a controversial area as that of union-security agreements." *Id.* at 362. In *New Mexico Fed'n of Labor v. City of Clovis*, 735 F. Supp. 999 (D.N.M. 1990), the court followed *Puckett*'s lead and held that because Congress intended to preempt the field, § 14(b)'s use of "State" had to be read narrowly.

Both of these rulings predated the Supreme Court's *Mortier* and *Ours Garage* decisions and did not grapple with the Court's fundamental rationale in those cases. Again, "[a]bsent a

clear statement to the contrary, Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429. Both *Puckett* and *City of Clovis* rely on field-preemption notions to infer Congress's implied intent in ways rejected by the Court in *Mortier* and *Ours Garage*. Because it has subsequently been made clear that silence in referring to "State," without differentiating political subdivisions, is insufficient to establish a clear and manifest purpose to preempt local authority, *Puckett* and *City of Clovis* have no persuasive weight.

### 3. *Conclusion re § 14(b)*

In sum, contrary to the district court's ruling, the Supreme Court's rulings in *Mortier* and *Ours Garage* and the Sixth Circuit's ruling in *State of Tennessee v. FCC* represent strong support for Hardin County's position that § 14(b)'s use of "State" includes political subdivisions. We find no persuasive basis—whether in the statutory language, legislative history or rules of construction—for distinguishing or circumventing them. In fact, the one rule of construction in play—presumption of consistent usage—actually favors the same construction that *Mortier*, *Ours Garage*, and *State of Tennessee* all support. Applying their teaching, we conclude that § 14(b)'s use of "State" includes political subdivisions and that Ordinance 300's right-to-work protection is included in § 14(b)'s exception from preemption.

### B. Field Preemption

Yet the Unions contend that this construction would frustrate Congress's intent to preempt the field of industrial relations regulation. Because the district court concluded that § 14(b) does not encompass laws of a State's political subdivisions, but only laws adopted by the State itself, the court went on to consider whether, and conclude that, the NLRA preempts Hardin County's right-to-work law. In *Mortier*, the Court summarized the ways in which federal law may preempt state law:

> The ways in which federal law may pre-empt state law are well established and in the first instance turn on congressional intent. Congress' intent to supplant state authority in a particular field may be expressed in the terms of the statute. Absent explicit pre-emptive language, Congress' intent to supersede state law in a given

area may nonetheless be implicit if a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, if the Act of Congress . . . touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or if the goals sought to be obtained and the obligations imposed reveal a purpose to preclude state authority. When considering pre-emption, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Even when Congress has not chosen to occupy a particular field, pre-emption may occur to the extent that state and federal law actually conflict. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

It is, finally, axiomatic that for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.

*Mortier*, 501 U.S. at 604–05 (internal quotation marks, alterations and citations omitted).

There are thus three types of preemption, all of which turn on Congress's intent. Federal law may be deemed to preempt state and local law (1) by explicit language; (2) implicitly, by virtue of pervasive federal regulation of a particular field; or (3) implicitly, by virtue of an actual conflict between federal and state or local regulations. Only the second of these three ways is at issue here. That is, there is no contention that local right-to-work laws like Hardin County's are expressly preempted by the NLRA. Nor is there an argument that the ordinance is preempted because an employer's compliance with it—by refraining from requiring an employee to join a union or pay union dues and fees—would result in violation of a federal regulation. Rather, the challengers of Ordinance 300 contend that Congress has manifested its intent to preempt *implicitly* by its pervasive regulation of industrial relations. Specifically, they rely on *Garmon* field preemption, as defined in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).

In relevant part, *Garmon* provides:

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so

plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.  Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.  Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

* * * *

When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

*Id.* at 244, 245.  *Garmon* preemption "is intended to preclude state interference . . . with enforcement of the 'integrated scheme of regulation' established by the NLRA."  *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986)).  "*Garmon* pre-emption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'"  *Id.* (quoting *Wisconsin Dep't of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986)).

Because Congress has sought to regulate industrial relations comprehensively, the States are implicitly denied freedom to regulate any activity that is even arguably subject to § 8 of the NLRA.  The specific activity here at issue is employers' freedom to enter into union security agreements.  While § 8(a)(3) prohibits employers from discriminating based on union membership and even from encouraging or discouraging union membership, it also explicitly provides that employers *may*, under federal law, enter into union-security agreements without running afoul of these prohibitions.  Hardin County's ordinance, rendering union-security agreements unlawful, regulates an activity that is arguably protected under § 8(a)(3).

As such, under *Garmon* preemption, the County's ordinance could be deemed implicitly preempted—*but for* the § 14(b) exception.  For even assuming *Garmon* field preemption would otherwise apply, Congress can hardly be deemed to have *implicitly* intended to preempt a state law that it has *explicitly* excepted from preemption.  The operation of *Garmon* field preemption to supplant the Hardin County right-to-work ordinance is thus ultimately dependent on the

answer to the question whether § 14(b)'s explicit exception of state law from preemption encompasses laws of the political subdivisions of the State.

This conclusion is confirmed by the Supreme Court's decision in *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96 (1963). In *Schermerhorn*, the Court held that § 14(b) recognizes the power of the States to outlaw union security agreements notwithstanding *Garmon* preemption:

> [Section] 14(b) gives the States power to outlaw even a union-security agreement that passes muster by federal standards. Where Congress gives state policy that degree of overriding authority, we are reluctant to conclude that it is nonetheless enforceable by the federal agency in Washington.

> This result on its face may seem to be at war with *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, decided in 1959, and holding that where action is "arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." 359 U.S. at 245.

> * * * *

> *Garmon*, however, does not state a constitutional principle; it merely rationalizes the problems of coexistence between federal and state regulatory schemes in the field of labor relations; and it did not present the problems posed by § 14(b), viz., whether the Congress had precluded state enforcement of select state laws adopted pursuant to its authority. The purpose of Congress is the ultimate touchstone.

> * * * *

> The Court in *Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board*, 336 U.S. 301, 314 [(1949)] stated that "§ 14(b) was included to forestall the inference that federal policy was to be exclusive" on this matter of union-security agreements.

> * * * *

> Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements authorized by § 14(b) and decided to suffer a medley of attitudes and philosophies on the subject.

> As a result of § 14(b), there will arise a wide variety of situations presenting problems of the accommodation of state and federal jurisdiction in the union-security field.

*Schermerhorn*, 375 U.S. at 103–05.

The Court thus recognized in *Schermerhorn* that even though state laws prohibiting union security agreements may represent an obstacle to the accomplishment of Congress's purpose of promoting uniformity, they do not fall victim to *Garmon* field preemption because Congress, whose purpose is the "ultimate touchstone," expressly provided that they are not preempted.[4]

Accordingly, per the teaching of *Mortier* and *Ours Garage*, the dispositive question is whether Congress's use of "State" in § 14(b) includes, beyond mere silence, indication of a clear and manifest purpose to preempt state authority to delegate governmental power to its political subdivisions. As explained above, no showing of such a clear and manifest purpose has been made. The parties and amici have argued at some length about the significance of dicta appearing in various opinions, legislative history, and policy concerns. But none of the arguments amounts to a showing of clear and manifest purpose rebutting the presumption arising from *Mortier* and *Ours Garage* that "State" includes political subdivisions of the State. They are the very kinds of arguments that the Supreme Court rejected in *Mortier* and *Ours Garage*. It follows that § 14(b)'s *explicit* exception of state right-to-work laws from preemption trumps operation of *implicit* field preemption. Because Hardin County's right-to-work ordinance is "State law," it is not preempted.

## C. Hiring-Hall Agreements and Dues-Checkoff Provisions

Ordinance 300 also includes two other provisions related to its right-to-work guarantee that are challenged by the plaintiff Unions. The ordinance prohibits employers and unions from entering into so-called "hiring hall" agreements, under which prospective employees are required "to be recommended, approved, referred, or cleared by or through a labor organization." R. 5-1, Ordinance 300, § 4(E), Page ID 96. The ordinance also prohibits so-called "dues checkoff" provisions, whereby employers deduct "union dues, fees and assessments or other charges" from

---

[4]That this § 14(b) exception is the *only* exception to NLRA preemption of right-to-work laws finds facial support in a footnote in *Oil, Chemical and Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 413 n.7 (1976): "There is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." The parties dispute the significance of this footnote, but even assuming *Garmon* field preemption would otherwise operate to invalidate the right-to-work protection of Ordinance 300 if it were not encompassed within § 14(b), the fact is that the ordinance *is* "State law" under § 14(b), per the teaching of *Mortier* and *Ours Garage*, and is therefore expressly excepted from preemption.

an employee's compensation for a labor organization unless the employee, with the right to revoke at any time, has authorized the deduction in writing. *Id.* at § 5. The district court held that the ordinance's prohibitions of hiring-hall agreements and dues-checkoff provisions are subject to preemption and are not encompassed within the § 14(b) exception. *United Automobile*, 160 F. Supp. 3d at 1013–14. On appeal, Hardin County concedes that these provisions do not come within the literal ambit of § 14(b), but contends that the practical *effect* of hiring-hall and dues-checkoff provisions is to require union membership and is therefore at odds with the County's right-to-work guarantee. The County also concedes that the extant case law on these questions is not supportive of its position, but argues it is neither definitive nor controlling.

In *SeaPAK v. Industrial, Technical & Professional Employees*, 300 F. Supp. 1197 (S.D. Ga. 1969), the court acknowledged that the obligation to pay dues to a union is the practical equivalent of requiring union membership, citing *NLRB v. General Motors Corp.*, 373 U.S. 734, 743 (1963). Yet, the court held that a state law regulating such a dues-payment arrangement did not come within the § 14(b) exception and was preempted because it overlapped with, and was in conflict with, federal regulation under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(4). This ruling was summarily affirmed by the Fifth Circuit, 423 F.2d 1229 (5th Cir. 1970), and the Supreme Court, 400 U.S. 985 (1971). *See also Local 514, Transport Workers Union v. Keating*, 212 F. Supp. 2d 1319, 1327 (E.D. Okla. 2002) (following *SeaPAK*), *aff'd*, 358 F.3d 743 (10th Cir. 2004).

While Hardin County maintains that its ordinance regulation of dues checkoff provisions does not actually conflict with that of the LMRA, the fact remains that the activity is subject to regulation under the LMRA. Allowing dual regulation under federal and state law would undermine Congress's purposes and contravene field preemption. The analysis set forth in *SeaPAK* is not conclusive, but it bears the Supreme Court's imprimatur and its authority remains essentially unchallenged by any conflicting case law authority.

The same result obtains in relation to the County's regulation of hiring-hall agreements. In *Simms v. Local 1752, Int'l Longshoremen Ass'n*, 838 F.3d 613, 619–20 (5th Cir. 2016), the Fifth Circuit recently held that Mississippi's right-to-work law's prohibition of compulsory

union membership as a condition of hiring is excepted from NLRA preemption by § 14(b), but the law's regulation of hiring-hall fees paid by hired employees who are not union members—even though requirement of such fees may encourage union membership—does not come within § 14(b) and is therefore preempted because nondiscriminatory use of hiring halls is permissible under NLRA § 8(a)(3). *See also Local 514 v. Keating*, 212 F. Supp. 2d at 1326–27 (citing *Laborers' Int'l Union Local 107 v. Kunco, Inc.*, 472 F.2d 456, 458–59 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770–71 (9th Cir. 1965); *NLRB v. Houston Chapter Ass'd Gen'l Contractors*, 349 F.2d 449, 451 (5th Cir. 1965), *cert. denied*, 382 U.S. 1026 (1966)).

Perceiving no sound reason to depart from the above authorities, we find no error in the district court's decision to follow them. The district court properly held that the Ordinance 300 provisions dealing with hiring-hall agreements and dues-checkoff requirements are preempted and unenforceable.

## III. CONCLUSION

Accordingly, the district court's judgment must be affirmed in part and reversed in part. Because the Hardin County ordinance's right-to-work protection is expressly excepted from preemption by Congress in NLRA § 14(b), the district court's judgment order invalidating the ordinance in this respect, is **REVERSED**. That is, to the extent § 4(B) of Ordinance 300 prohibits employers from requiring membership in a labor organization as a condition of employment, it is not preempted and invalidated by the NLRA. In all other respects, the court's judgment, declaring § 4(E) and § 5 of Ordinance 300 unenforceable because not excepted from preemption under NLRA § 14(b), is **AFFIRMED**.