In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 17-1300 & 17-1325

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 399, *et al.*,

*Plaintiffs-Appellees, Cross-Appellants*,

*v.*

VILLAGE OF LINCOLNSHIRE, *et al.*,

*Defendants-Appellants, Cross-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 2395—**Matthew F. Kennelly**, *Judge*.

_____

ARGUED MARCH 27, 2018 — DECIDED SEPTEMBER 28, 2018

_____

Before WOOD, *Chief Judge*, and BAUER and KANNE, *Circuit Judges*.

WOOD, *Chief Judge*. The National Labor Relations Act and its amendments establish a national system of industrial-labor relations. The question before us in this case is whether a municipality—specifically, the Village of Lincolnshire, Illinois—can add to or change that system through a local ordinance. Lincolnshire passed an ordinance that purports to do three

things: (1) forbid the inclusion of union-security or hiring-hall provisions in collective bargaining agreements, (2) forbid the mandatory use of hiring halls, and (3) forbid dues checkoff arrangements. The Village asserted that it had the right to do so under section 14(b) of the National Labor Relations Act, 29 U.S.C. § 164(b), which permits *states* to bar compulsory union membership as a condition of employment. Lincolnshire contends that, as a political subdivision of Illinois, it is entitled to exercise the state's power in this respect.

Whether a local law, rather than a state-wide law, falls within the scope of section 14(b) is a subject that has divided other courts. The Sixth Circuit, in *United Automobile, Aerospace & Agricultural Implement Workers of America Local 3047 v. Hardin County, Kentucky*, 842 F.3d 407 (6th Cir. 2016), agreed with the Village that it does, but only for union-security clauses. The Sixth Circuit found hiring-hall and dues-checkoff provisions comparable to those in the Lincolnshire ordinance to be outside the scope of section 14(b) and thus preempted by the NLRA. On the other side of the fence, Kentucky's highest court has held that section 14(b) does not permit local legislation on the topic of either union-security or mandatory use of hiring-halls or dues-checkoffs. See *Kentucky State AFL-CIO v. Puckett*, 391 S.W. 2d 360 (Ky. Ct. App. 1965).[1] With all due respect to our sister circuit, on the union-security clause issue we find ourselves persuaded by the position that Kentucky

---

[1] Until 1976, the highest court of Kentucky was the Court of Appeals of Kentucky. Pursuant to the Amendment of May 29, 1975, effective at the beginning of 1976, Kentucky restructured its courts, and so the highest court now is the Supreme Court of Kentucky.

took, although our reasons differ somewhat.[2] We agree with both courts that localities may not address the subjects of hiring halls or dues checkoffs. We thus conclude that the authority conferred in section 14(b) does not extend to the political subdivisions of states and affirm the judgment of the district court holding Lincolnshire's ordinance preempted and without force.

## I

In 2015 Lincolnshire adopted Ordinance Number 15-3389-116 ("the Ordinance"). Section 4 of the Ordinance bans union-security agreements within the Village by forbidding any requirement that workers join a union, compensate a union financially, or make payments to third parties in lieu of such contributions. Section 4(B)–(D). Section 4 also bars any requirement that employees "be recommended, approved,

[2] This case reveals an interesting gap in Circuit Rule 40(e), which requires circulation to the full court when a panel decision would create a conflict with another circuit. The rule says nothing about the creation of a conflict with the highest court of a state, notwithstanding the fact that Supreme Court Rule 10(a) includes cases in which a United States court of appeals "has decided an important federal question in a way that conflicts with a decision by a state court of last resort." One goal of Circuit Rule 40(e) is to ensure that this court does not lightly create the type of conflict that can be resolved only through intervention by the Supreme Court. A conflict in the circuits is certainly one such situation, see S. Ct. Rule 10(a) clause 1, but as just noted, so is a conflict between a court of appeals and a state court of last resort, see S. Ct. Rule 10(a) clause 2. Given the current language of Circuit Rule 40(e), however, because this opinion would create a conflict with the Sixth Circuit, we are circulating it to all members of the court in regular active service, even though it does not create the kind of conflict described in Supreme Court Rule 10(a). No judge in regular active service wished to hear this case *en banc*. Judge Flaum did not participate in consideration of this hearing *en banc*.

referred, or cleared for employment by or through a labor or-
ganization." Section 4(E). Finally, section 5 prohibits employ-
ers from making any payments to unions on a worker's behalf
except pursuant to a "signed written authorization" that
"may be revoked by the employee at any time by giving writ-
ten notice." Section 5. The Ordinance provides both civil rem-
edies and criminal penalties for its violation.

A collection of unions sued Lincolnshire, asserting that the
National Labor Relations Act of 1935 ("Wagner Act"), as
amended by the Labor Management Relations Act of 1947
("Taft-Hartley Act"), preempts the Ordinance. (The references
in this opinion to the NLRA mean the Act as amended.) Their
complaint asserts that sections 4(B)–(D), 4(E), and 5 of the Or-
dinance violate the Supremacy Clause and 42 U.S.C. § 1983.

The district court resolved the case on motions for
summary judgment. It first found that all of the unions had
standing to challenge the membership and fee provisions of
section 4(A)–(D) and the checkoff regulation of section 5, but
that only one of the unions could challenge the prohibition of
hiring halls in section 4(E). We find the court's analysis in this
respect to be sound, and there is no need to say more, since
neither side has appealed from these rulings. The district
court then held all three provisions to be preempted by the
NLRA. In No. 17-1300, Lincolnshire has appealed from this
determination. The district court also ruled that the unions
failed to state a claim under section 1983, because it
understood them to be asserting *Garmon*, rather than
*Machinists*, preemption claims. See *Golden State Transit Corp.
v. City of L.A.*, 493 U.S. 103, 110–13 (1989). Relying on that
ruling, it prevented the unions from claiming attorney's fees

under 42 U.S.C. § 1988. In No. 17-1325, the unions have cross-appealed the latter decision.

## II

### A

Before turning to the heart of the case, we note that the unions' invocation of the Supremacy Clause was proper in this instance. Although the Supremacy Clause does not create a freestanding private right of action, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), a plaintiff may "sue to enjoin unconstitutional actions by state and federal officers" in violation of supreme federal law by invoking courts' equitable powers or through the comparable mechanisms provided by the Declaratory Judgment Act. *Restoration Risk Retention Grp., Inc. v. Gutierrez*, 880 F.3d 339, 346 (7th Cir. 2018) (quoting *Armstrong*, 135 S. Ct. at 1384). That is what the unions have done here.

### B

If it were not for section 14(b), the NLRA would preempt all three aspects of Lincolnshire's Ordinance. State law must give way to federal law, the Supreme Court has explained, in a number of instances: when Congress has enacted a statute expressly preempting state law; when there is "a framework of regulation so pervasive ... that Congress left no room for the States to supplement it or where there is a federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and when state laws conflict with federal law, either because compliance with both is a physical impossibility, or because "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and citations omitted); see *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The first of these possibilities is usually called field preemption, and we begin there. The Supreme Court has confirmed that section 8 of the NLRA occupies the field for any activities that it "may fairly be assumed" fall within the ambit of the NLRA. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). The negotiation and adoption of the types of provisions at issue here—union-security clauses, hiring-hall rules, and dues checkoffs—are such activities. *E.g.*, *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 284 (1971); see also *id*. at 296 (noting that, with respect to union-security clauses, "federal concern is pervasive and its regulation complex"); *Oil, Chem. & Atomic Workers, Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409 (1976).

Section 8(a)(3) of the NLRA bars, as an unfair labor practice, any "discrimination in regard to … employment or any term or condition of employment to encourage or discourage membership in any labor organization." It also provides that nothing in the NLRA "or in any other statute of the United States, shall preclude" requiring new hires to join a union within 30 days, unless specified exceptions apply. 29 U.S.C. § 158(a)(3). That is enough to conclude—again, putting section 14(b) to the side for a moment—that the union-security provisions of the Ordinance impermissibly encroach on a field that has been occupied by section 8 of the NLRA. See *Sweeney v. Pence*, 767 F.3d 654, 661 (7th Cir. 2014) (finding analogous provisions in an Indiana statute governed union membership within the meaning of section 8). The same is true of the hiring-hall and dues-checkoff provisions, although

our emphasis below will be on union-security clauses, as that is the only point of disagreement between the Sixth Circuit and us.

The Supreme Court has recognized that laws banning union-security agreements clash with section 8(a)(3) and thus can be saved only if they fall within the scope of section 14(b):

> While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law … [s]ection 14(b) allows a State or Territory to ban agreements "requiring membership in a labor organization as a condition of employment." We have recognized that with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy "[t]here is … conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws … . "

*Mobil Oil Corp.*, 426 U.S. at 416–17 (quoting *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103 (1963)) (alteration in original). The question before the Court in *Mobil Oil* was whether Texas's right-to-work laws could override an agency-shop requirement covering unlicensed seamen who were hired in Texas, but who spent "the vast majority of their working hours on the high seas." 426 U.S. at 410. The Court concluded that Texas law did not reach this far and that "predominant job situs is the controlling factor in determining whether, under § 14(b), a State can apply its right-to-work laws to a given employment relationship." *Id.* at 420. Most (though not all) of the seamen's work was done on the high seas, "outside the territorial bounds of the State of Texas." *Id.*

This was enough to conclude that the exception to national labor policy recognized in section 14(b) was not triggered.

In the absence of applicable legislation under section 14(b), the question whether to have a union-security agreement constitutes a mandatory subject of bargaining under the NLRA, and refusal to bargain may amount to an unfair labor practice. *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 744–45 (1963); *Atlas Metal Parts Co., Inc. v. NLRB*, 660 F.2d 304, 308 (7th Cir. 1981); see also *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 759 (6th Cir. 2003); *Eastex, Inc. v. NLRB*, 437 U.S. 556, 569 (1978). In states that have adopted right-to-work laws, however, the tables are turned: not only is there no duty to bargain over these clauses; the clauses themselves are forbidden as a matter of state law. See, *e.g.*, *Sweeney*, 767 F.3d at 671.

Illinois does not have a state-wide right-to-work law. Perhaps that is why Lincolnshire passed the Ordinance. But it is not such a simple matter to say that the state's power to pass such a law has been, or may be, delegated to its subdivisions. Sometimes that is true, and sometimes it is not. Lincolnshire is a home-rule city, and so we assume for present purposes that it has broad regulatory powers. Lincolnshire concedes, however, that if Illinois were to pass a specific statute *forbidding* the state's political subdivisions to legislate in this area, then it would be out of luck. We put that state-law issue to one side, however, since the broader question is whether as a matter of federal law section 14(b) authorizes political subdivisions to act in this area.

A local union-security provision would seriously undermine the objectives of the NLRA in any state that has not taken advantage of section 14(b) to forbid agency shops. The

NLRA "favors permitting [union-security] agreements unless a State or Territory with a sufficient interest in the relationship expresses a contrary policy via right-to-work laws." *Mobil Oil Corp.*, 426 U.S. at 420. It does this in part to avoid free-riding. *Id*. at 416. Recognition of this aim has motivated the Supreme Court to monitor carefully the scope of states' authority to override that policy. See *id*. at 420 (holding that even though Texas may have had more contacts than any other state with the employment relationship at issue, its right-to-work law did not apply because the predominant situs of the employment was not in Texas). Lincolnshire's Ordinance undermines that congressional goal by banning any collective bargaining agreement designed to ensure that workers shoulder their portion of the costs of representation. If the State of Illinois had passed a right-to-work law, as 28 other states have done, a different congressional goal would be implicated: the one expressed in section 14(b) requiring deference to the state's choice. But as we have said, Illinois has done no such thing.

The hiring hall aspect of Lincolnshire's ordinance also runs into problems with preemption. Like the union-security part, it falls within the purview of section 8. *Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25*, 430 U.S. 290, 303 n.11 (1977) ("Discrimination in hiring hall referrals constitutes an unfair labor practice under §§ 8(b)(1)(A) and 8(b)(2) of the NLRA."); see also *Local 357, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. NLRB*, 365 U.S. 667, 675 (1961) (noting that section 8 permits hiring halls *other than* those which are discriminatory). State regulation of hiring halls is therefore blocked by field preemption. *E.g., United Auto.*, 842 F.3d at 421–22; *Laborers' Int'l Union of N. Am., Local No. 107 v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770–71 (9th Cir. 1965).

The use of hiring-halls routinely has been treated as a mandatory subject of bargaining and thus hiring-hall provisions are affirmatively permitted by the NLRA. *E.g., Clarett v. Nat'l Football League*, 369 F.3d 124, 140–41 (2d Cir. 2004); *Sw. Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1113 (D.C. Cir. 1986); *NLRB v. Sw. Sec. Equip. Corp.*, 736 F.2d 1332, 1338 (9th Cir. 1984); *NLRB v. Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449, 452 (5th Cir. 1965); *Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 143 N.L.R.B. 409, 415 (1963). Lincolnshire's attempt to prohibit them requires unions and employers to choose between complying with national or municipal law and thus creates an actual conflict.

Finally, Lincolnshire's dues-checkoff regulation is preempted. Dues checkoff provisions are mandatory subjects of bargaining. *E.g., Tribune Publ'g Co. v. NLRB.*, 564 F.3d 1330, 1333 (D.C. Cir. 2009); *NLRB v. J.P. Stevens & Co.*, 538 F.2d 1152, 1165 (5th Cir. 1976); *United Steel Workers of Am. v. NLRB*, 390 F.2d 846, 849 (D.C. Cir. 1967). Their negotiation is thus subject to section 8, and federal law requires state law to yield. *Garmon*, 359 U.S. at 244. In this respect too the Lincolnshire Ordinance threatens an actual conflict with federal law: it permits employers to remit dues only pursuant to *fully revocable* checkoffs, while federal law requires employers to bargain in good faith over checkoff proposals that bind both parties for up to *one year*.

Section 302 of the Taft-Hartley Act comprehensively regulates the payment of fees by employers, including payments to unions. 29 U.S.C. § 186. This includes a provision allowing for checkoffs to pay union fees under certain circumstances. *Id.* § 186(c)(4). The statutory scheme represents a careful balancing of interests and leaves no room for regulation—

complementary or otherwise—by subnational units of government. See *United Auto.,* 842 F.3d at 421 ("While Hardin County maintains that its ordinance regulation of dues checkoff provisions does not actually conflict with that of the LMRA [Labor Management Relations Act], the fact remains that the activity is subject to regulation under the LMRA. Allowing dual regulation under federal and state law would undermine Congress's purposes and contravene field preemption."); *SeaPAK v. Indus., Technical & Prof'l Emps., Div. of Nat'l Mar. Union,* 300 F. Supp. 1197, 1200 (S.D. Ga. 1969), *summarily aff'd* 423 F.2d 1229 (5th Cir. 1970).

We conclude, therefore, that the Ordinance's provisions invade territory occupied by federal law. Lincolnshire can prevail only if we accept the argument that section 14(b) authorizes not just states, but also any of a state's political subdivisions, to override the background federal rules in any of the three ways set forth in the Ordinance.

## III

Our starting point is the language of the statute. The Taft-Hartley Act added section 14(b) to the NLRA in 1947. See Pub. L. No. 86-257, Title VII, § 701(a). That provision reads as follows:

**(b) Agreements requiring union membership in violation of State law**
Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in

which such execution or application is prohibited by
State or Territorial law.

29 U.S.C. § 164(b). Section 14(b) is the exclusive source of
states' authority to pass right-to-work laws. *Mobil Oil Corp.*,
426 U.S. at 413 n.7. Thus, this case does not turn on whether
states—as a domestic matter—may delegate some or all of
their own powers to localities. Rather, it depends on whether,
as a matter of statutory interpretation, Congress meant to in-
clude local laws when it referred to "State or Territorial law."

The only serious issue before us relates to the agency-shop
aspect of the Ordinance. As the Sixth Circuit recognized, sec-
tion 14(b) does not authorize any government—state or lo-
cal—to restrict the use of hiring halls or checkoffs. *United
Auto.*, 842 F.3d at 421–22.  We noted the same thing in *Sweeney*
when we observed that section 14(b) "applies to post-hiring
union security arrangements," not to "pre-hiring practices"
such as the use of hiring halls. 767 F.3d at 663 n.8. As we ex-
plained in *Sweeney*, using a hiring hall does "not require pro-
spective employees to do anything more than temporarily
visit union facilities during the hiring process." *Id*. The appli-
cant need not make any continuing commitment to the union
if and when he secures employment. Other circuits to con-
sider the issue have come to the same conclusion. *Simms v.
Local 1752, Int'l Longshoremen Ass'n*, 838 F.3d 613, 618–20
(5th Cir. 2016); *Kunco, Inc.*, 472 F.2d at 458–59; *United Auto.*,
842 F.3d at 421–22; *Tom Joyce Floors, Inc.*, 353 F.2d at 771.

Checkoff provisions, though they govern relationships
with the union after hiring, are also different from "member-
ship" within the meaning of section 14(b). They do not, in and
of themselves, require employees either to join unions or to
make any payments to them. Rather, they facilitate payments

once employees have themselves made the decision to contribute to a union or to accept a job requiring that contribution. To state the matter differently, filling out a checkoff form does not determine union membership either way: "The dues checkoff section of the [Taft-Hartley] Act … far from being a union security provision, seems designed as a provision for administrative convenience in the collection of union dues. An employee could revoke the dues deduction authorization, and yet continue to pay dues personally." *NLRB v. Atlanta Printing Specialties & Paper Prods. Union 527*, 523 F.2d 783, 786 (5th Cir. 1975). In short, checkoff provisions do not compel workers to pay anything. They thus do not constitute "agreements requiring membership in a labor organization" as understood by this court in *Sweeney*. 767 F.3d at 660–61. Here, too, the circuits are in agreement. *NLRB v. Shen-Mar Food Prods., Inc.*, 557 F.2d 396, 399 (4th Cir. 1977); see also *United Auto.*, 842 F.3d at 421–22; *Atlanta Printing Specialties & Paper Prods. Union 527*, 523 F.2d at 786.

This takes us to the central question on appeal: does section 14(b) permit a state to delegate to some or all of its subdivisions the power to ban agency shops at the local level? A devotee of the "plain language" approach to statutory interpretation might think that the answer to this question must be "no," because nothing in the language of section 14(b) refers to local legislation: it speaks exclusively of "State or Territorial law." To state the obvious, municipalities are not states, and municipal law applies only within the regulating municipality, varying from place to place. And indeed, Congress sometimes calls out political subdivisions by name. For example, the NLRA defines "employer" to exclude "any State or political subdivision thereof." 29 U.S.C. § 152(2). Elsewhere, the Act authorizes the director of the NLRB to "establish

suitable procedures for cooperation with State and local me-diation agencies." 29 U.S.C. § 172(c). See *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) (word "law" did not in-clude regulations in statutory section that did not mention "rules" or "regulations," unlike other parts of the same law).

But Congress sometimes allows states to entrust matters arising under federal laws to lower levels of government without saying anything on the subject. In the field of anti-trust, for instance, the Supreme Court has concluded that the Sherman Act does not displace clearly established and ac-tively supervised state regulations of economic activity. See *Parker v. Brown*, 317 U.S. 341 (1943). But *Parker* does not insist that qualifying legislation comes exclusively at the state level. To the contrary, as cases such as *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), demonstrate, certain municipal leg-islation also qualifies (with a few tweaks not pertinent here).

We prefer, therefore, not to rely on the literal terms of the statute here. Labor law is one of the rare areas in which Con-gress has preempted the field, and so states have no power in the area except with respect to their own employees. True, section 14(b) cedes some power back to the states, but it makes no sense to say that states can re-delegate that power. As we explain in more detail below, no one would be able to figure out what is legal and what is not. The situation with Medicaid is similar: states have the power to choose whether to opt into Medicaid, but that power must be exercised by the state as a whole and cannot be redelegated. See 42 U.S.C. § 1396a(a)(1) (state plan for medical assistance must be in effect in all polit-ical subdivisions of the state and be mandatory in them).

Construed the way the Village would have it, the Ordi-nance would put employers in and around the Village in an

impossible position. An employer with offices within the Village whose workers' predominant job situs is outside the Village in a jurisdiction without a comparable law would risk committing an unfair labor practice if it *refused* to bargain over an agency-shop provision. The same employer would risk civil or criminal penalties if it misjudged "predominant" job situs and *did* bargain over an agency-shop rule, if most of its work was done within the Village. Over what period should the employer make this assessment: a week? a month? a year? The employer's duty to bargain or prohibition on bargaining might shift from day to day, or month to month, or job to job.

Construing section 14(b) to permit re-delegation would create other administrative nightmares as well. There were 38,910 general purpose governments in the United States in 2012, and more than 90,000 general and special-purpose governments combined. *Carma Hogue, Government Organization Summary Report: 2012*, U.S. CENSUS BUREAU 1 (2013), https://www.census.gov/content/dam/Census/library/publications/2013/econ/g12-cg-org.pdf, as compared to just 50 states and a handful of territories. Illinois alone has almost 7,000 local governments. *Id*. Not only are these jurisdictions more numerous than the states by several orders of magnitude, but they are also smaller. In many trades or industries, the job sites of workers might bring them to numerous municipalities every week. Even a single plant might cross municipal lines. Lincolnshire, as of the 2010 Census, had a population of 7,275 people, and covered an area of 4.68 square miles in Lake County, Illinois. The idea that businesses operate exclusively within its borders strikes us as fanciful. Is an employee subject to an agency agreement one day, when his job takes him to nearby Chicago, and not the next day, when he happens to be working on-site in Lincolnshire? What if

neighboring Buffalo Grove has the opposite law? The sensible conclusion is that section 14(b) operates only at the state level.

This reveals another problem with the Ordinance. It does not limit its effect to employees whose primary work situs is in the Village, as required by *Mobil Oil*. That case, as we noted earlier, held that "under § 14(b), right-to-work laws cannot void agreements permitted by § 8(a)(3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws." 426 U.S. at 414. There is no reason why this principle would not apply to political subdivisions.

Lincolnshire responds that employers already must comply with separate state laws, so why assume that they could not do the same with municipal laws? The answer is simple: at some point a difference in degree becomes a difference in kind. Complying with 7,000 different laws in Illinois alone is quite different from making border adjustments between Illinois and Indiana, two states with different policies governing agency shops. It would be impossible as a practical matter for a collective bargaining agreement to account for each jurisdiction's ordinances. Could an employer be held liable for committing an unfair labor practice for refusing to engage in a separate round of horse-trading with workers in each locale? Has a Lincolnshire employer who just landed a lucrative contract in Chicago committed a criminal violation in Lincolnshire because it has agreed to join a multi-employer bargaining unit with an agency-shop rule that is legal at the work situs? As a practical matter, would bargaining units be limited to individual municipalities? What happens to employees who move regularly between job sites? Is a manufacturer precluded from shifting its employees between assembly lines if

they would cross into a different municipality's right-to-work régime?

Permitting local legislation under section 14(b) threatens "a crazy-quilt of regulations." The "consequence of such diversity for both employers and unions would be to subject a single collective bargaining relationship to numerous regulatory schemes thereby creating an administrative burden and an incentive to abandon union security agreements." *New Mexico Fed'n of Labor, United Food & Commercial Workers Union Local 1564 v. City of Clovis*, 735 F. Supp. 999, 1002–03 (D.N.M. 1990).

Interpreting the words "State or Territory" in section 14(b) to permit delegation to local units of government would thus do violence to the broad structure of labor law—a law that places great weight on uniformity. Construing the words "State or Territory" to preclude delegation assures that only a limited number of these conflicts exists. It avoids adding an onerous and ever-shifting new factual layer to the inquiry. Similarly, it avoids introducing a new legal inquiry into the mix: did the locality have the authority to pass the ordinance in question as a matter of state law? Some units of local government have home-rule authority, others do not; some are special-purpose, others are general-purpose. The variations both within states and from state to state are endless.

The consequences for the uniformity of national labor law would be catastrophic. The Supreme Court has said that Congress enacted the NLRA to create national uniformity in labor law, *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters, Chauffeurs & Helpers Local Union*, 346 U.S. 485, 490 (1953)); see also *Cannon v. Edgar*, 33 F.3d 880, 883 (7th Cir. 1994), and to minimize industrial strife, see *NLRB v. Jones*

*& Laughlin Steel Corp.*, 301 U.S. 1, 41, 45 (1937). While section 14(b) represents a decision that some variation at the state and territorial level is acceptable, that does not mean that national uniformity itself has been abandoned as a goal. Notably, while the parties cite extensively to the legislative history of the Wagner and Taft-Hartley Acts, the congressional debates' repeated references to safeguarding state authority contain no mention of local autonomy.

Against these concerns, the Sixth Circuit, in *United Auto.*, and Lincolnshire offer in support of the possibility of delegation under section 14(b) two decisions from the Supreme Court in other areas of law, *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991), and *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424 (2002). Neither *Mortier* nor *Ours Garage*, however, abandoned the principle that the meaning of words in a statute "depends upon the character and aim of the specific provision involved." *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973) (holding that same phrase, "State or Territory," encompasses the District of Columbia when used in 42 U.S.C. § 1982 but excludes the District when used in the context of a prior version of 42 U.S.C. § 1983, *id*. at 421–32).

*Mortier* concerned the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq*. At that time, FIFRA stated that "[a] State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. § 136v. It expressly defined "State" to include states, the District of Columbia, and various U.S. territories, without any mention of subdivisions. *Id*. at § 136(aa). The Court noted, however, that

nothing in either the statute or its legislative history suggested preemption of local regulation. *Mortier*, 501 U.S. at 607–08, 611–12, 614–16. Indeed, it found clues in the statutory language indicating that the exclusion of local authorities would have created tensions within the Act:

> [For example,] § 136f(b) requires manufacturers to produce records … upon the request of any employee of the EPA "or of any State or *political subdivision*, duly designated by the Administrator." Section 136u(a)(1), however, authorizes the Administrator to "delegate to any State … the authority to cooperate in the enforcement of this [Act] through the use of its personnel." If the use of "State" in FIFRA impliedly excludes subdivisions, it is unclear why the one provision would allow the designation of local officials for enforcement purposes while the other would prohibit local enforcement authority altogether.

*Mortier*, 501 U.S. at 608–09 (emphasis added).

*Mortier* concluded that for FIFRA, the failure to mention political subdivisions was not enough to support an inference that Congress had forbidden all local regulation. This, as we already have noted, contrasts sharply with the scope of the NLRA and the Court's consistent interpretation of it. Moreover, *Mortier* asked not whether the mention of "State" in section 136v authorized localities to regulate matters otherwise beyond their remit, but rather whether that word alone forbade them from exercising such power. *Id.* at 614. In other words, the first question in *Mortier* was whether FIFRA had any preemptive effect at all. Federal statutes do not supersede a state's "historic police powers … unless that was the clear and manifest purpose of Congress," *id.* at 605 (quoting *Rice*,

331 U.S. at 230), and, as a baseline assumption, political sub-divisions are understood as "components" of the state for purposes of the police power. *Id.* at 608; see also *id.* at 607–08 (citing, *inter alia*, *Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907)). That is why the mere reference to states in section 136v gave no reason to suspect that Congress implicitly intended to supplant local regulation—let alone that this silence was a clear and manifest statement of such a purpose.

*Mortier* did suggest that the Supreme Court would still have concluded that section 136v affirmatively authorized the delegation to local governments of the authority to implement FIFRA (an environmental law regulating pesticide use). The ability to regulate noxious substances has been part of the police power since time out of mind. The Supreme Court assumes that "the historic police powers of the States" are not to be superseded by federal law unless that was "the clear and manifest purpose of Congress." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008). The Court found no such purpose in *Mortier*. The federal labor laws, as we already have explained, are a different matter altogether. As the Kentucky Court of Appeals indicated, 391 S.W. 2d at 362, we should construe exceptions to the NLRA carefully, with an eye both to the scope of the exception and to its effect on the remainder of the law.

*Ours Garage* is also distinguishable. There an express preemption provision in the Interstate Commerce Act generally forbade "a State, political subdivision of a State, or political authority of 2 or more States" to adopt regulations "related to a price, route, or service of any motor carrier … with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The law said, however, that it would not "restrict the safety regulatory authority of a State with respect to

motor vehicles." *Id*. at § 14501(c)(2)(A). Despite the omission of any reference to political subdivisions in the latter clause, the Supreme Court held that states could delegate their preserved authority to localities. *Ours Garage*, 536 U.S. at 428–29. As the Court wrote, "[a]bsent a clear statement to the contrary, Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Id*. at 429.

*Ours Garage* acknowledged that it presented a "closer call" than was the case in *Mortier*. *Id*. at 433. The general preemption provision (49 U.S.C. § 14501(c)(1)) "explicitly preempt[ed] regulation both by a State and by a political subdivision of a State." *Id*. Yet there were other parts of the statute that said nothing about political subdivisions. The Court concluded as follows:

> We acknowledge that § 14501(c)'s disparate inclusion [and] exclusion of the words "political subdivisions" support an argument of some force, one that could not have been made in *Mortier.* Nevertheless, reading § 14501(c)'s set of exceptions in combination, and with a view to the basic tenets of our federal system pivotal in *Mortier*, we conclude that the statute does not provide the requisite clear and manifest indication that Congress sought to supplant local authority.

536 U.S. at 434 (internal quotation marks omitted).

*Ours Garage*, like *Mortier*, concerned the scope of an express preemption provision and therefore (as the excerpt above shows) was governed by the rule that the Court

requires a "clear and manifest indication that Congress sought to supplant local authority." *Id*. Section 14(b) plays a different function. It is not the source of NLRA preemption; rather, it is an exception to the general preemption established in the Act for the field of labor relations. The question is only how much subnational authority does section 14(b) *restore.*

*Ours Garage* depended heavily on an extensive contextual analysis that looked to other parts of section 14501(c)—provisions that have no corollary in the NLRA. *E.g.*, *Ours Garage*, 536 U.S. at 434–36. It is also significant that *Ours Garage* concerned a local safety regulation, which is the type of law that raises concerns about undue interference with the states' police power. *Id*. at 437, 438. Although states once used their police powers to enact sweeping anti-labor laws, for nearly a century the regulation of unions has rested with the federal, rather than state, government. Finally, the Court emphasized that the Interstate Commerce Act primarily concerned itself with economic regulation, while the local ordinance addressed traditional safety concerns. *Id*. at 440–42. Municipalities could legislate on the latter topic without directly offending the statute's central goals. In contrast, Lincolnshire's regulation addresses collective bargaining head-on—the central concern of the NLRA.

Lincolnshire finally argues that, because local governments are creatures of the state, they can *always* exercise under federal law any powers Congress has given to the state, if the state in turn has delegated those powers to its subdivisions. *Hunter*, 207 U.S. at 178. As we already have pointed out, however, the rule is more nuanced: sometimes Congress allows redelegation, as in *Mortier*, *Ours Garage,* and *Parker,* and sometimes it does not, as in the Medicaid example we gave. The

aspect of labor law governed by section 14(b) of the NLRA, we conclude, falls in the latter category.

## IV

We thus agree with the unions that the district court correctly found preemption of the Ordinance with respect to all three of the aspects at issue: the agency shop, the hiring hall, and the dues checkoff. This disposes of Appeal No. 17-1300. As we noted briefly at the outset, the unions filed a cross-appeal, No. 17-1325, in which they sought damages under 42 U.S.C. § 1983 for Lincolnshire's violation of their rights. Such a claim is possible only if the unions were able to show preemption under the Supreme Court's *Machinists* decision, which recognizes that some state legislation is preempted because it interferes with Congress's intention that the conduct involved be left to the "free play of economic forces." *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140–41 (1976) (internal quotation marks omitted). *Garmon* preemption, in contrast, addresses the problem of state regulation that would interfere with the primary jurisdiction of the National Labor Relations Board. *Id.* at 138. It does not involve the kind of personal right that would support a claim under section 1983.

We conclude that the union's attempt to bring a *Machinists* claim comes too late. In the district court, the unions' brief in support of their own motion for summary judgment made no mention of section 1983. While a page of their brief in opposition to Lincolnshire's competing motion did touch on the subject, it mentioned neither *Garmon* nor *Machinist* preemption and thus made no evident effort to situate the claim in the latter camp. "[A] party [that] fails to adequately present an issue to the district court has waived the issue for purposes of

appeal … even though the issue may have been before the district court in more general terms." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). We cannot say that the unions fairly presented their position to the district court. Nor can we fault the district court for failing to anticipate the unions' arguments for why *Machinist* preemption applies. We thus see no reason to disturb the district court's judgment in this respect either on the merits or with regard to attorneys' fees.

## V

Section 14(b) of the NLRA does not permit local governments on their own authority to ban agency-shop, hiring hall, or checkoff agreements. In the absence of an applicable state law with respect to the agency-shop, as here, all three measures are preempted by federal law. Finally, the unions failed to properly preserve their claim under section 1983, and so the district court did not err by dismissing it. We therefore AFFIRM the judgment of the district court.